# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY CORONADO, | 1:11-cv-01960-LJO-BAM (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | [ECF No. 1] |
| A. BITER, | |
| Respondent. | |

Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND[1]

Following a jury trial in the Merced County Superior Court, Petitioner was convicted of premeditated attempted murder (Cal. Penal Code §§ 664(a), 187)[2] with enhancements for personal use of a firearm causing injury (§ 186.22(b)(5)), and separate counts of discharging a firearm at an inhabited camper (§ 246) and unlawful participation in a criminal gang (§186.22(a)).  Petitioner was sentenced to an indeterminate term of 40 years to life.

Petitioner filed a timely notice of appeal.  On November 9, 2010, the California Court of Appeal, Fifth Appellate District issued a reasoned decision affirming Petitioner's conviction.

On January 12, 2011, the California Supreme Court denied review.

---

[1] This information is taken from the state court documents lodged by Respondent on July 17, 2012.

[2] All further statutory references are to the California Penal Code unless otherwise indicated.

1   Petitioner filed the instant federal petition for writ of habeas corpus on November 28,

2   2011.  Respondent filed an answer to the petition on June 29, 2012.  Petitioner did not file a

3   timely traverse.

4   ### STATEMENT OF FACTS[3]

5   **I.   Prosecution Evidence**

6   **A. Ruben's and Rudy's Testimony**

7   Ruben was born in 1955.  He lived in the small community of Livingston.
    Timothy was one of Ruben's nephews; Ruben knew him since birth.  Ruben knew
8   M.E. his entire life.  Ruben was familiar with Steven, who he knew by a
    nickname, but they did not socialize.
9
    Ruben became a Norteno gang member in his 30's after a failed marriage.
10  He suffered two felony drunk driving convictions in 1991 and 1992.  He was
    convicted of felony drunk driving for the third time in 1996 and sent to prison.
11  After his release, he had some parole violations for unspecified acts.

12  Ruben went to church services while he was imprisoned.  In 2007, he gave
    his heart to God.  He quit drinking and partying and quietly dropped out of the
13  Norteno gang by ceasing to associate with other gang members.  No one bothered
    him; he was accepted as an "older guy" who went to church.
14
    Ruben's son, Rudy, was a member of the Livas set of the Nortenos.
15  Timothy, M.E. and Steven were fellow gang members.  In 2009, Rudy decided to
    drop out of the gang.  Rudy believed that Timothy, Steven and M.E. were
16  criticizing him for this choice.  Rudy decided to confront and fight them.  He was
    going to let them "beat him up or whatever" to get the "satisfaction that they
17  wanted."

18  Rudy asked his father to accompany him to a gathering of gang members.
    He stated, "Just in case, Dad, they beat me down."  Don't let them kill me.  Don't
19  let them beat me, Dad."  Ruben was going to stand by and watch, "[j]ust in case to
    pick him up in case he got knocked out."
20
    Rudy drove to Steven's house with Ruben and an unidentified third
21  person.  None of them was armed.  When Rudy got out of the car, he was
    approached by M.E. and Timothy.  They were both armed with handguns.  M.E.
22  handed his gun to Timothy, who then passed it to a third person.  Steven and
    about seven or eight other gang members also were present.
23
    Rudy and Steven began arguing.  Rudy hit Steven, briefly knocking him
24  unconscious.  Timothy and M.E. attacked Rudy.  Ruben was struck in the head.

25

26  Rudy fell to the ground.  Ruben grabbed M.E. and was about to hit him but

27  _____

28  [3] This statement of facts is taken from the appellate court's November 10, 2010 decision which is presumed
    correct.  28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

stopped when he heard someone ask for a gun.  Rudy and Ruben retreated back to their car because they did not have any weapons.

Rudy saw Steven grab a shotgun from a closet in the garage.  Steven's mother and father came outside.  They tried to take the shotgun from Steven.  M.E. grabbed it from Steven.  M.E. exclaimed that he would shoot Ruben.

Rudy drove Ruben home.

Later that evening, Ruben and another son, Robert, were watching television and talking.  Ruben was lying down.  He heard a loud banging on his door and someone asking for Rudy.  Ruben jumped up and opened the door.  Although it was dark outside, the area was illuminated by an interior overhead light near the door. [FN 5] Timothy, Steven and M.E. were standing outside.  Timothy and M.E. were each holding handguns.  Steven was holding either a rifle or a shotgun.

As Ruben began to move backward, all three assailants started shooting.  Ruben suffered five gunshot wounds.  Numerous bullets struck the trailer's interior.

They stopped shooting.  Ruben, who had fallen to the ground, thought "they were going to walk up and finish me off."  Ruben reached for a gun.  He told Robert to turn off the light and Robert broke it.  The shooters left.

Ruben did not identify the shooter to the responding police officers.  However, he did tell an officer that three people shot him; he did not say that two people shot at him.  He does not remember telling an officer that he was asleep when someone knocked on his door.

On May 5, a drive-by shooting occurred at Rudy's house.  Rudy testified that shots were fired through his front window on May 5.  He was hit in the right forearm and his granddaughter was hit in the chest and one of her hands.  Rudy believed the shooting was committed by members of the Livas set of Nortenos.  It was stipulated that the identities of the assailants were unknown.

Ruben believed the drive-by shooting was gang related.  Ruben prayed and sought counsel from a friend.  He was reluctant to identify his nephews as his assailants.  Yet, Ruben "was mad at why would they shoot a little innocent girl."

About six weeks after Ruben was shot, he went to the police.  He identified Timothy, Steven and M.E. as the people who shot him because the violence has "got to stop somewhere."  Ruben identified them "[m]ostly because they shot an innocent little girl."  Ruben thought by identifying his assailants, he could protect Rudy and his granddaughter.

**B.     Other Prosecution Evidence**

Merced County Sheriff's Deputy Brandon Soto reported to the crime scene.  He testified that Ruben told him that he was sleeping when he heard a knock at the door.  "He got up, answered the door and what he believed was two individuals standing there with what he thought were rifles started shooting at him."  Soto asked Ruben if he could describe either of them and Ruben replied that he did not remember anything.  Soto testified that when he and another deputy approached the trailer, there were no sources of illumination other than

3

their flashlights.  He did not recall any lights on inside the trailer.

Merced County Sheriff's Detective Charles Hale photographed the crime scene.  He observed numerous bullet holes inside the trailer.  He recovered a slug consistent with a .38-caliber bullet from the inside of a drawer.  The bullet could have been shot from a revolver.  No shell casings were found at the scene.

Dr. Harris M.E. Goodman treated Ruben at the hospital.  Ruben sustained wounds to the right shoulder, cheek, neck, abdomen and left hip.

Merced County Sheriff's Detective Lane Clark testified that he interviewed Ruben while he was hospitalized.  When Clark asked Ruben who shot him, Ruben replied, "[I]t was in God's hands."

On May 12, Ruben went to the police station and asked to speak to Clark.  Ruben told him that Timothy, M.E. and Steven were the people who shot him.  Ruben said he was coming forward because his granddaughter had been shot and the violence needed to stop.  Ruben told Clark about the altercation between Rudy and Steven on the evening of March 9.  Ruben said that several people, including Timothy, M.E. and Steven, had firearms in their possession during this altercation.  Clark showed Ruben a photo lineup and Ruben identified Steven as one of the shooters.

On May 14, a search warrant was executed at Steven's home.  A Bersa .380-caliber semiautomatic pistol was found in the attic above his parent's bedroom. [FN 6] A 12-gauge shotgun was found in a van that was parked inside the garage.  A box of .12-gauge shotgun shells that fit the shotgun and five .380-caliber cartridges that fit inside the Bersa pistol were found in a closet in the garage.  Five .410-gauge shotgun shells and a box of 12-gauge shotgun shells were found inside the drawers of a desk that was inside the closet.  Employment documentation in Steven's name and a utility bill addressed to him were found on top of the desk.  Gang paraphernalia was found in the house.

FN 6. The slug recovered from the trailer was not fired from this gun.

Merced County Sheriff's Detective Alex Barba testified that Steven's father, Eleazor Magana, was present during the search.  Eleazor said that he saw [Petitioner] and his friends with a shotgun a couple weeks before the search.  Eleazor was shown the pistol found in the attic.  Eleazor said that he believed it "belonged to Steven and his other son because they were gang members."

Eleazor testified that he did not make these statements to the officer.  Eleazor denied that the guns belonged to him.  He testified that on one occasion he saw a shotgun or rifle.  He told Steven that he did not want any trouble at home and Steven hid the gun.

Livingston Police Lieutenant Christopher Soria gave expert gang testimony.  Livas is an active street gang that is a Norteno subset.  Soria testified about the gang's primary criminal activities and predicate offenses.  Soria opined that Timothy and Steven were active Norteno members.  Steven's brother, Eleazor Renteria Magana, was a Norteno who was convicted of murder and other felonies in 2008.

Soria testified that prison gangs have a blood in-blood out oath: the only

4

way to leave the gang was to be killed.  Gang members who attempted to leave gangs have been assaulted, beaten and shot.

Soria also testified that respect is of great importance to a gang and its members.  Force, fear and intimidation are used to obtain respect.  To be disrespected is a serious insult.  A gang member's failure to respond to disrespect would be perceived as weakness.

When presented with a hypothetical altercation similar to the facts in this case, Soria opined the shooting would have been committed to benefit the gang as a way to regain respect. [FN 7]

FN 7. Ruben also testified that respect is very important to gang members. Steven lost respect when he challenged Rudy and then lost the fight.

Christopher Devrits, an astronomy professor at California State University, Stanislaus, gave expert testimony about the moon's position and illumination on May 9.  The weather was clear and it was one day before a full moon.  He opined that the lighting conditions at 10:30 p.m. were nearly optimal.

It was stipulated that in a prior adjudication it was found true that Steven committed a felony in 2001 which prohibits him from possessing a firearm.

## II.    Defense Evidence

Neither defendant testified.

Steven's mother testified that after the fight two or three people stayed outside talking.  Eventually, Steven went inside with his parents and siblings.  His mother stayed up until midnight.  Steven was at home the entire evening.  His mother admitted that the first time she offered this information was to defense counsel during the trial.  Also, when her son, Eleazor Renteria Magana, was on trial for murder in 2008, she and her husband testified he was home at the time of the murder.

Steven's girlfriend testified that she arrived at his house after the fight. M.E. and Timothy were there.  She left and returned after dinner.  There were 10 to 20 guys in the garage, including M.E., Timothy and Steven.  After talking for a while, most of them left.  Steven and a few other guys went inside the house.  She did not remember who they were.  Steven played a video game with them.  She remained at the house until 12:30 or 1:00 a.m.  Steven was home the entire evening.

(LD[4] 4, Opinion at 3-9.)

///

///

///

---

[4] "LD" refers to the documents lodged by Respondent with his answer.

**DISCUSSION**

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Merced County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008 (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.   Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court."  Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000).  Habeas relief is also available if the state court's decision "involved an unreasonable

application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

///
///

1 III.   Insufficient Evidence Petitioner Was One Of The Shooters

2         In the instant petition for writ of habeas corpus, Petitioner presents the following three

3 separate and distinct claims for relief: (1) insufficient evidence to establish guilt beyond a

4 reasonable doubt; (2) the eye-witness identification of Petitioner was not reliable and did not

5 prove guilt beyond a reasonable doubt; and (3) no evidence corroborated the eye-witness's

6 identification.  (Am. Pet. at 5-6.)

7         Respondent argues and the Court agrees that in his petition for review filed to the

8 California Supreme Court, Petitioner raised only the first claim that his conviction was not

9 supported by proof beyond a reasonable doubt.  (LD 5.)  Thus, to the extent Petitioner seeks to

10 present claims 2 and 3 as separate and distinct claims, they are unexhausted.  Nonetheless, the

11 Court can deny relief because the claims are without merit.  See 28 U.S.C. § 2254(b)(2)

12 (application for writ of habeas corpus may be denied on the merits notwithstanding the failure to

13 exhaust in state court); Cassett v. Stewart, 406 F.3d 614, 623 (9th Cir. 2005).

14         The California Court of Appeal issued the last reasoned decision denying the claim stating

15 in pertinent part:

16         It is a well-recognized legal principle that the testimony of a single witness
           is sufficient to prove a disputed fact unless the testimony is inherently improbable

17         or physically impossible.  (People v. Young (2005) 34 Cal.4th 1149, 1181; People
           v. Scott (1978) 21 Cal.3d 284, 296.)

18
19         "'"'To warrant the rejection of the statements given by a witness who has
           been believed by a trial court, there must exist either a physical impossibility that

20         they are true, or their falsity must be apparent without resorting to inferences or
           deductions. [Citations.] Conflicts and even testimony which is subject to justifiable

21         suspicion do not justify the reversal of a judgment, for it is the exclusive province
           of the trial judge or jury to determine the credibility of a witness and the truth or

22         falsity of the facts upon which a determination depends. [Citation.]'" [Citations.]
           Further, a jury is entitled to reject some portions of a witness' testimony while

23         accepting others. [Citation.]  Weaknesses and inconsistencies in eyewitness
           testimony are matters solely for the jury to evaluate." (People v. Allen (1985) 165

24         Cal.App.3d 616, 623.)

25         Nonetheless, [Petitioner] argues that Ruben's testimony was legally
           insufficient to support the jury's verdict.  He contends that eyewitness

26         identifications are unreliable.  He points out that Ruben did not immediately
           identify the shooters, that an officer testified Ruben initially said there were two

27         shooters and that Ruben's testimony included details.  Not previously mentioned to
           the police.  Also, he contends that Ruben might have falsely identified Timothy
           because he was angry about the drive-by shooting.

28

                                                    8

These were all factors for the jury to assess when determining whether Ruben was a credible witness. Alleged weaknesses in identification testimony of a single witness are to be evaluated by the jury. (*People v. Fagalilo* (1981) 123 Cal.App.3d 524, 530; *People v. Allen*, *supra*, 165 Cal.App.3d at p. 623.) When "the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court." (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1499.) We do not reassess a witness's credibility and substitute our evaluation or the one made by the fact finder. (*Vazquez*, *supra*, 178 Cal.App.4th at p. 352.)

We do not find Ruben's identification of Timothy as one of the shooters to be inherently improbable. This is not a situation where a witness caught a fleeting glimpse of a stranger. Ruben was Timothy's uncle; he had known Timothy for his entire life. Expert testimony was proffered to establish that the outdoor lighting conditions were optimal. Ruben testified there was a light on inside the trailer near the door which illuminated the surrounding area. He had not mentioned this detail prior to trial because no one asked him about it. Ruben did not have any prior convictions involving moral turpitude. For all of these reasons, this case is not one of the rare instances in which a reviewing court could conclude as a matter of law that the in-court eyewitness identification was unreliable and therefore legally insufficient to prove a disputed fact. Ruben's identification of Timothy as one of the shooters alone is sufficient to prove this fact. *(In re Gustavo M.*, *supra*, 214 Cal.App.3d at p. 1497.)

In any event, there was some additional evidence supporting the determination that Timothy was one of the shooters.

Ruben testified that he saw Timothy holding a handgun during the confrontation prior to the shooting. The slug recovered at the scene was consistent with a .38-caliber bullet and could have been shot from a handgun.

Also, the gang expert testified that Timothy was a member of the Livas set of Nortenos. The expert explained about the crucial importance of respect to gang members. The jury could reasonably conclude that Timothy shared in the desire to restore the respect the gang lost during the fight with Rudy prior to the shooting.

Finally, neither Steven's mother nor his girlfriend testified that Timothy remained at Steven's house after the confrontation with Rudy.

For all these reasons, we hold that the record contains substantial evidence from which a rational jury could find beyond a reasonable doubt that Timothy was one of the people who shot Ruben. Ruben's eyewitness identification was not inherently improbable or physically impossible and we discern no basis to overturn the jury's verdicts. The convictions did not infringe Timothy's due process rights.

(LD 4, Opinion at 10-12.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential

1  elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

2  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

3      A federal court "makes no determination of the facts in the ordinary sense of resolving

4  factual disputes."  Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir. 2007) (internal quotation marks

5  omitted), vacated in part, 503 F.3d 822 (9th Cir. 2007), and rev'd on other grounds, __ U.S. __,

6  129 S.Ct. 823, 172 L.Ed.2d 532 (2009).  When a federal court is presented with a factual record

7  "that supports conflicting inferences [it] must presume-even if it does not affirmatively appear in

8  the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must

9  defer to that resolution."  Jackson, 443 U.S. at 326.  "Circumstantial evidence and inferences

10  drawn from it may be sufficient to sustain a conviction."  United States v. Reyes-Alvarado, 963

11  F.2d 1184, 1188 (9th Cir. 1992).

12      The Ninth Circuit has held that the AEDPA requires an additional degree of deference to a

13  state court's resolution of a sufficiency of the evidence.  Thus, federal habeas relief is not

14  warranted unless "the state court's application of the Jackson standard [was] 'objectively

15  unreasonable.'"  Juan H. v. Allen, 408 F.3d 1262, 1275 n.13 (9th Cir. 2005).

16      As an initial matter, Petitioner's contention goes to the weight of the evidence and the

17  credibility of Ruben's testimony.  On habeas review, however, the credibility of Ruben's

18  testimony, which is sufficient to sustain the conviction, see People v. Scott, 21 Cal.3d 284, 296

19  (1978) ("[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction,

20  unless the testimony is physically impossible or inherently improbable."), is entitled to near-total

21  deference, i.e., it "is generally beyond the scope of review."  See Schlup v. Delo, 513 U.S. 298,

22  330 (1995) ("[T]he assessment of the credibility of witnesses is generally beyond the scope of

23  review.");  Sarausad, 479 F.3d at 678 ("A jury's credibility determinations are entitled to near-total

24  deference [.]") (internal quotation marks and citation omitted).

25      In any event, there was sufficient evidence to support the jury's finding of guilt beyond a

26  reasonable doubt.  Ruben and his son, Rudy, went to Steven Magana's house to confront him to

27  further Rudy's effort to drop out of the gang.  (RT 293-294, 311-312.)  Petitioner was at Magana's

28  house and was carrying a pistol. (RT 297.)  Rudy struck Magana, and Petitioner and Evans

immediately began fighting with Rudy.  (RT 301.)  Petitioner was a known member of the Livas

gang and was Ruben's nephew whom he had known his entire life.  Ruben openly admitted that

he did not initially disclose the identify of the shooter to police, and later did so because they shot

at his son and young granddaughter.  Petitioner's counsel was provided the opportunity to

thoroughly cross-examine Ruben regarding his identification of Petitioner.  (See RT 239-248.)  In

addition, as reasonably found by the appellate court, there was no evidence to find that Petitioner

remained at Steven Magana's house after the initial confrontation with Rudy.  Based on this

evidence, the state courts' determination that Petitioner's conviction was supported by substantial

evidence beyond a reasonable doubt was neither an unreasonable application of, nor contrary to,

clearly established federal law, and relief is foreclosed.

IV.    Eye-Witness Identification Not Reliable to Prove Guilt Beyond a Reasonable Doubt

    Petitioner also contends that Ruben's identification of him as the shooter was not reliable

and did not prove guilt beyond a reasonable doubt.  Respondent argues that regardless of whether

this claim is considered as a stand-alone unexhausted claim, or as part of Claim 1, it is without

merit and must be denied.  The Court agrees.

    In the last reasoned decision, the state appellate court found the eye-witness identification

was not sufficiently unreliable and held:

>     [Petitioner] argues that Ruben's testimony was legally insufficient to
> support the jury's verdict.  He contends the eyewitness identifications are
> unreliable.  He points out that Ruben did not immediately identify the shooters,
> that an officer testified Ruben initially said there were two shooters and that
> Ruben's testimony included details not previously mentioned to the police.  Also,
> he contends that Ruben might have falsely identified Timothy because he was
> angry about the drive-by shooting.

>     These were all factors for the jury to assess when determining whether
> Ruben was a credible witness.  Alleged weaknesses in identification testimony of a
> single witness are to be evaluated by the jury.  When the circumstances
> surrounding the identification and its weight are explored at length at trial, where
> eyewitness identification is believed by the trier of fact, that determination is
> binding on the reviewing court.  We do not reassess a witness's credibility and
> substitute our evaluation or the one made by the fact finder.

>     We do not find Ruben's identification of [Petitioner] as one of the shooters
> to be inherently improbable.  This is not a situation where a witness caught a
> fleeting glimpse of a stranger.  Ruben was [Petitioner's] uncle; he had known
> [Petitioner] for his entire life.  Expert testimony was proffered to establish that the
> outdoor lighting conditions were optimal.  Ruben testified there was a light on

1  inside the trailer near the door which illuminated the surrounding area.  He had not
2  mentioned this detail prior to trial because no one asked him about it.  Ruben did
   not have any prior convictions involving moral turpitude.  For all of these reasons,
3  this case is not one of the rare instances in which a reviewing court could conclude
   as a matter of law that the in-court eyewitness identification was unreliable and
   therefore legally insufficient to prove a disputed fact.  Ruben's identification of
4  [Petitioner] as one of the shooters alone is sufficient to prove this fact.

5  (LD 4, Opinion at 10-11, citations omitted.)

6          As previously noted, "the relevant question is whether, after viewing the evidence in the

7  light most favorable to the prosecution, any rational trier of fact could have found the essential

8  elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319.  "'Circumstantial

9  evidence and inferences drawn from it may be sufficient to support a conviction.'"  Walters v.

10 Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).  It the sole province of the jury to

11 "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from

12 basic facts to ultimate facts."  Jackson, 443 U.S. at 319.

13         The determination of whether Ruben's identification of Petitioner as one of the shooters

14 was reliable was the sole province of the jury.  "When no improper identification law enforcement

15 activity is involved, . . .  it suffices to test reliability through the rights and opportunities generally

16 designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous

17 cross-examination, protective rules of evidence, and jury instructions on both the fallibility of

18 eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt."

19 Perry v. New Hampshire, __ U.S. __, 132 S.Ct. 716, 721 (2012).  The testimony by a single

20 witness, "if solidly believed, is sufficient to prove the identity of a perpetrator of a crime."  United

21 States v. Smith, 563 F.2d 1361, 1363 (9th Cir. 1977).  The fact that Ruben did not initially

22 identify the shooters was presented to the jury and Ruben's testimony was subject to extensive

23 cross-examination.  During cross-examination and in closing argument, Petitioner's counsel

24 focused specifically on the weaknesses of Ruben's eyewitness identification.  (RT 248-265, 741-

25 749.)  The jury properly weighed any discrepancies in Ruben's testimony and gauged his

26

27

28

1  credibility.  The jurors were instructed with CALCRIM Nos. 226[5] and 315[6] and were apprised that

2  eyewitness testimony must be evaluated for reliability pursuant to specified factors.

3          Accordingly, based on the jury instructions and counsel's argument, the jurors were made

4  aware of the weaknesses of Ruben's identification and there was a sufficient basis to question the

5  reliability of Ruben's identification.  See United States v. Christophe, 833 F.2d 1296, 1300 (9th

6  Cir. 1987) ("[S]killful cross examination of eyewitness, coupled with appeals to the experience

7  and common sense of jurors, will sufficiently alert jurors to specific conditions that render a

8  _____

9  [5] CALCRIM No. 226 specifically stated:

10  You alone, must judge the credibility or believability of the witnesses.  In deciding whether
     testimony is true and accurate, use your common sense and experience.  You must judge the
11  testimony of each witness by the same standards, setting aside any bias or prejudice you may have.
     You may believe all, part, or none of any witness's testimony.  Consider the testimony of each
12  witness and decide how much of it you believe.

13  In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or
     disprove the truth or accuracy of that testimony. . . .

14  (CT 207-208; RT 696.)

15

16  [6] CALCRIM No. 315 provided:

17  You have heard eyewitness testimony identifying the defendants.  As with any other witness, you must
     decide whether an eyewitness gave truthful and accurate testimony.

18  In evaluating identification testimony, consider the following questions:

19
     •     Did the witness know or have contact with the defendant before the event?
20   •     How well could the witness see the perpetrator?
     •     What were the circumstances affecting the witness's ability to observe, such as lighting, weather
21         conditions, obstructions, distance, and duration of observation?
     •     How closely was the witness paying attention?
22   •     Was the witness under stress when he or she made the observation?
     •     Did the witness give a description and how does that description compare to the defendant?
23   •     How much time passed between the event and the time when the witness identified the defendant?
     •     Was the witness asked to pick the perpetrator out of a group?
24   •     Did the witness ever fail to identify the defendant?
     •     Did the witness ever change his or her mind about the identification?
25   •     How certain was the witness when he or she made an identification?
     •     Are the witness and the defendant of different races?
26   •     Was the witness able to identify other participants in the crime?
     •     Were there any other circumstances affecting the witness's ability to make an accurate
27         identification?

28  (CT 210; RT 664-665.)

particular eyewitness identification unreliable."); see also United States Labansat, 94 F.3d 527, 530 (9th Cir. 1996) ("Any weaknesses in eyewitness identification testimony can ordinarily be revealed by counsel's careful cross-examination of the eyewitnesses.").  Accordingly, the state courts' rejection of this claim was not contrary to, or an objectively unreasonable application of, any clearly established Supreme Court law and did not involve an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

V.      Lack of Corroborating Evidence of Eye-Witnesses's Identification

Petitioner contends that Ruben's identification of him as the shooter was not adequately corroborated and there was no evidence to corroborate that he possessed a handgun.

As noted above, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319.  Circumstantial evidence is sufficient to support a conviction.  United States v. Reyes-Alvarado, 963 F.3d at 1188. The jury is entrusted to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the underlying facts.  Jackson, 443 U.S. at 319.

The testimony of a single witness may be sufficient evidence to support a conviction. Indeed, in this instance, the jury was instructed with CALCRIM No. 301 which stated, "[t]he testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."  (CT 210; RT 753.)   Here, Ruben had known Petitioner his entire life and was able to properly identify him based on the natural lighting conditions the evening of the shooting on March 9, 2009.  The eye-witness identification of Petitioner is sufficient, alone, to support Petitioner's convictions.  Accordingly, the state courts' rejection of this claim was not contrary to, or an objectively unreasonable application of, any clearly established Supreme Court law and did not involve an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

///

///

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   __March 22, 2013__          _____/s/ **Barbara A. McAuliffe**_____
                                          UNITED STATES MAGISTRATE JUDGE